NOT FOR PUBLICATION                                    (Doc. No. 11)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**
**CAMDEN VICINAGE**

———————————————————————  :
                                          :
KISS ELECTRIC, LLC,                       :
                                          :
                    Plaintiff,            :
                                          :   Civil No. 14-3281 (RBK/AMD)
              v.                          :
                                          :   **OPINION**
WATERWORLD FIBERGLASS                     :
POOLS, N.E., INC.,                        :
                                          :
                    Defendant.            :
———————————————————————  :

**KUGLER**, United States District Judge:

      Plaintiff Kiss Electric, LLC ("Plaintiff") brings this uncontested Motion for Default Judgment pursuant Fed. R. Civ. P. 55(b)(2) against Defendant Waterworld Fiberglass Pools, N.E., Inc. ("Defendant"). (Doc. No. 11.) This action arises under state statutory and common law, and includes claims for breach of contract, unjust enrichment, promissory estoppel, misrepresentation, and a violation of New Jersey's Payment Act, and requests both monetary damages and equitable relief. For the reasons stated herein, the Motion will be **GRANTED**, with further instructions for Plaintiff to file additional materials in order to satisfy the Court concerning the various damage amounts due.

## I.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

      Prior to April 29, 2014, Plaintiff and Defendant had several ongoing contractual dealings related to the installation of swimming pools and the provision of the necessary electric work at Defendant's customers' homes. (Amended Complaint ("Compl.") ¶¶ 9-10.) Typically, Defendant would enter into a contract with a homeowner to manufacture and install a swimming

pool and Defendant would, through invoice or purchase order, subcontract the related electrical work to Plaintiff.  (Id. ¶ 10.)

Up and until April 29, 2014, Plaintiff provided labor, materials, and services under contract with Defendant at five properties (the "Performed Jobs"), for which Defendant has not paid.  (Id. ¶ 11.)  The amount due to Plaintiff for its work on the Performed Jobs is equal to $21,425.00.  (Id.; Ex. 1 to Compl., Performed Jobs Invoices ("Invoices").)[1]

During and prior to this time, Defendant also asked Plaintiff to purchase or rent equipment and supplies for an additional nine projects (the "Pending Jobs").  (Id. ¶ 12; see also Ex. 2 to Compl., Defendant's Pending Job Invoices ("Defendant's Invoices").)  As a result of Defendant's representations to Plaintiff concerning the Pending Jobs, Plaintiff incurred expenses in the amount of $22,500.00 in material and equipment purchased, and $11,500.00 for the rental and purchase of ditch diggers, all of which were job-specific expenses and could not be used for any other projects.  (Id. ¶ 13.)  Plaintiff would not have purchased or rented the aforementioned materials and equipment, but for Defendant's promise that Plaintiff would perform the Pending Jobs.  (Id. ¶ 14.)  However, Defendant would not allow Plaintiff to perform the Pending jobs, despite the fact that Plaintiff was ready, willing, and able to complete the jobs.  (Id. ¶ 12.)  In addition to the loss of the expenses occurred in anticipation of the Pending Jobs, Plaintiff also suffered lost profit related to the Pending jobs.  (Id. ¶ 15.)  The Pending Jobs were each priced at $5,356.25, for a total of $48,206.25, and this price included Plaintiff's overhead and profit.  (Id.)

---

[1] The Court notes that Plaintiff only included invoices for four of the five Performed Jobs, but the amount due quoted by Plaintiff in its Amended Complaint matches the amount due when the four invoices are added together. Accordingly, the Court accepts for purposes of this Motion that Plaintiff is owed $21,425.00 for the work done on the Performed Jobs.

During a meeting on May 5, 2014, between representatives of Plaintiff and Defendant concerning payment for the Performed Jobs, Defendant's owner orally agreed with Plaintiff that Plaintiff would be guaranteed at least 136 work orders throughout the season (the "Promised Jobs").  (Id. ¶ 16.)  Prior to that meeting, two members of Defendant's operations department orally agreed that Plaintiff would perform between 150-200 jobs over the course of the season. (Id.)  As a result of these representations, Plaintiff forbore from taking other projects that would interfere with the agreements and promises for jobs made by Defendant.  (Id.)  Perhaps not surprisingly, the Promised Jobs never materialized.  (Id. ¶ 18.)  Plaintiff claims that it has also loft profit related to the Promised Jobs.  (Id. ¶ 19.)

Finally, in light of Defendants misrepresentations which Plaintiff relied upon, Plaintiff used its electrician's stamp (the "Stamp") for permitting purposes on the Pending Jobs and the Promised Jobs.  (Id. ¶ 20.)  But for Defendant's misrepresentations, Plaintiff would not have used its Stamp in order that Defendant could obtain permits.  (Id. ¶ 21.)  Plaintiff believes that Defendant never had the intention of compensating Plaintiff for the Performed Jobs, or having Plaintiff perform the Pending Jobs or Promised Jobs.  (Id. ¶ 22.)  Instead, it is Plaintiff's belief that Defendant intend to mislead Plaintiff for the purposes of obtaining Plaintiff's Stamp in order to obtain permits and perform the Pending Jobs and Promised jobs on its own, or with a different, less reputable electrical contractor.  (Id. ¶ 23.)

As a result of Defendant's actions, Plaintiff has lost control of its Stamp and drawings the Stamp has been placed upon, ordered and rented material and equipment for the purposes of completing the Pending Jobs, suffered lost profits related to the Pending Jobs and Promised Jobs, and suffered damages related to the Performed Jobs.  (See id. ¶¶ 11, 25.)

Plaintiff filed its original Complaint in this matter on May 22, 2014.  (Doc. No. 1.) Summons was issued as to Defendant, and was returned executed on May 29, 2014.  (Doc. No. 6.)  The Court subsequently ordered that Plaintiff amend its Complaint, in order to properly allege diversity of citizenship (Doc. No. 7), which prompted Plaintiff to file its Amended Complaint on June 10, 2014.  (Doc. No. 8.)  On July 10, 2014, after receiving no response from Defendant, who had neither filed a responsive pleading nor entered an appearance in this matter, Plaintiff sought and received the Clerk of Court's entry of Default under Rule 55(a) on July 11, 2012.  (Doc. No. 9)[2]  Three months later, Plaintiff filed the instant Motion for Default Judgment on October 14, 2014.  (Doc. No. 11.)

## II.      DISCUSSION AND ANALYSIS

Rule 55(b)(2) allows the Court, upon a plaintiff's motion, to enter default judgment against a defendant that has failed to plead or otherwise defend a claim for affirmative relief. While the decision to enter default judgment is left principally to the discretion of the district court, there is a well-established preference in this Circuit that cases be decided on the merits rather than by default whenever practicable.  Hritz v. Woma Corp., 732 F.2d 1178, 1180-81 (3d Cir. 1984).  Consequently, the Court must address a number of issues before deciding whether a default judgment is warranted in the instant case.  If it finds default judgment to be appropriate, the Court's next step is to determine a proper award of damages.

---

[2] As a consequence of the Clerk of Court's entry of default against Defendant on July 11, 2014, and for purposes of deciding the instant Motion for Default Judgment, the Court accepts as true the factual allegations in Plaintiff's Amended Complaint, save those relating to the amount of damages.  United States v. Pinsky, Civ. No. 10-2280, 2011 WL 1326031, at *2 (D.N.J. Mar. 31, 2011) (citing Comdyne I, Inc. v. Corbin, 908 F.2d 1142, 1149 (3d Cir. 1990)).

A.      **Appropriateness of Default Judgment**

1.      The Court's Jurisdiction

First, the Court must determine whether it has both subject matter jurisdiction over Plaintiff's cause of action and personal jurisdiction over Defendant.  U.S. Life Ins. Co. in City of New York v. Romash, Civ. No. 09-3510, 2010 WL 2400163, at *1 (D.N.J. June 9, 2010). Verifying the Court's jurisdiction is of particular concern where, as here, the defaulting party has failed to make any sort of appearance or submit any responsive communication to the Court.

In this case, Plaintiff appears to assert state law claims for breach of contract, unjust enrichment, promissory estoppel, misrepresentation, and a violation of New Jersey's Payment Act, and requests both monetary damages and equitable relief.  However, the Amended Complaint properly alleges the citizenship of every party and that diversity of citizenship exists between the parties.  (Compl. ¶¶ 1, 3, 6.)  Consequently, the Court has diversity subject matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1332.

In addition, the Court must consider whether it may exercise personal jurisdiction over Defendant.  Because Defendant is alleged to be a citizen of New Jersey, this Court has jurisdiction over Defendant pursuant to Fed. R. Civ. P. 4(k)(1)(A).

2.      Entry of Default

Second, the Court must ensure that the entry of default under Rule 55(a) was proper. Rule 55(a) directs the Clerk of Court to enter a party's default when that party "against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise."  In this case, Defendant was properly served with a summons and the original Complaint on May 29, 2014.  (Doc. No. 6.)  Defendant failed to respond to the original Complaint within twenty-one days of service as required under Rule 12(a).  Thereafter, the Court ordered that Defendant amend the Complaint to properly allege the

5

citizenship of the parties, which it did on June 10, 2014.  (Doc. No. 8.)  Though Defendant

certified that it served the Amended Complaint by first class mail to the same address at which

original Complaint and summons were served and executed, Defendant again failed to respond to

the Amended Complaint within twenty-one days of service as required under Rule 12(a).

Plaintiff attested to these facts in a certification attached to its request for default.  (Doc. No. 11.)

Accordingly, the Clerk's entry of default under Rule 55(a) was appropriate.

### 3.   Plaintiff's Causes of Action

Third, the Court must determine whether Plaintiff's Amended Complaint states a proper

cause of action against Defendant.  In conducting this inquiry, the Court accepts as true a

plaintiff's well-pleaded factual allegations while disregarding its mere legal conclusions.  See

Directv, Inc. v. Asher, Civ. No. 03-1969, 2006 WL 680533, at *1 (D.N.J. Mar. 14, 2006) (citing

10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure §

2688, at 63 (3d ed. 1998)).  As stated above, Plaintiff alleges several causes of action:  (1) breach

of contract; (2) violation of New Jersey's Prompt Payment Act; (3) unjust enrichment; (4)

promissory estoppel; and (5) intentional misrepresentation.[3]  After a thorough review of

Plaintiff's Amended Complaint and the applicable law, the Court finds that Plaintiff has alleged

causes of action for breach of contract, promissory estoppel, and intentional misrepresentation,

and has sufficiently alleged that it is entitled to the damages available under the New Jersey

Prompt Payment Act.

---

[3] Plaintiff also alleges a "Demand for Equitable, Injunctive, and Declaratory Judgment" in Count VI of the Amended Complaint.  The Court, however, construes this Count as a prayer for relief, rather than an independent cause of action, and it discusses the propriety of equitable relief infra at Part II.B.4.

a)      <u>Breach of Contract</u>

To maintain a claim for breach of contract under New Jersey law, Plaintiff must allege: (1) the existence of a contract; (2) that Defendant breached the contract; (3) damages flowing Defendant's breach, and; (4) that Plaintiff performed its own contractual duties.  <u>See Video Pipeline, Inc. v. Buena Vista Home Entertainment, Inc.</u>, 210 F. Supp. 2d 552, 561 (D.N.J. 2002).

"A contract arises from offer and acceptance, and must be sufficiently definite 'that the performance to be rendered by each party can be ascertained with reasonable certainty.'" <u>Weichert Co. Realtors v. Ryan</u>, 128 N.J. 427, 435 (1992) (quoting <u>West Caldwell v. Caldwell</u>, 26 N.J. 9, 24-25 (1958)).  "Thus, if parties agree on essential terms and manifest an intention to be bound by those terms, they have created an enforceable contract." <u>Weichert</u>, 128 N.J. at 435.

Concerning the Performed Jobs and the Pending Jobs, Plaintiff has sufficiently stated a cause of action for breach of contract.  Regarding the Performed Jobs, Plaintiff has alleged that it was "under contract" with Defendant for the Performed Jobs, (Compl. ¶ 11), which Plaintiff completed.  Defendant breached those contracts by failing to pay the amount due to Plaintiff when it completed the Performed Jobs.

Though Plaintiff does not specifically allege the existence of a contract for the Pending Jobs, the circumstances pled by Plaintiff give rise to an enforceable obligation and a valid breach of contract claim.  First, Defendant promised that Plaintiff could perform those jobs and Plaintiff agreed.  In addition, Defendant asked that Plaintiff purchase and rent the equipment and supplies for the Pending Jobs, which Plaintiff did.[4]  Not only did Plaintiff rent and purchase certain

---

[4] The Court finds that Plaintiff's purchase and rental of the equipment and materials for the Pending Jobs was sufficient partial performance of the Pending Jobs that it rendered Defendant's promise to allow Plaintiff to perform those jobs enforceable.  <u>See</u> 2-6 Corbin on Contracts § 6.1 (noting that where "part performance is so rendered as to justify the implication of a promise to render the entire performance proposed in the offer," the entire unilateral contract may become binding).  Because of the significant and specific nature of the expenses undertaken by Plaintiff at Defendant's behest, the Court finds that the agreement for the Pending Jobs was a binding obligation,

7

materials and equipment, it used its Stamp to approve certain electrical plans and was "ready, willing, and able" to complete the Pending Jobs.  (Compl. ¶ 12.)  Then, when Defendant refused to allow Plaintiff to perform the Pending Jobs, Plaintiff suffered damages from the expenses already incurred and the profits lost from those jobs.

However, with respect to the Promised Jobs, Plaintiff has failed to plead enough information to establish the existence of an enforceable contract.  Though Defendant made a promise to Plaintiff when it guaranteed the Promised Jobs, this alone is insufficient to allege a valid contract.  A unilateral promise, without consideration, is no contract at all.  See Friedman v. Tappan Dev. Corp., 22 N.J. 523, 533 (1956); see also Oscar v. Simeonidis, 352 N.J. Super. 476, 485 (App. Div. 2002) (noting that while all valid contracts require consideration, this may involve only a "very slight advantage to one party, or a trifling inconvenience to the other").  Plaintiff has not pled any advantage given to Defendant, or inconvenience taken on in exchange for Defendant's promise.  In the Amended Complaint, Plaintiff does not allege that it vowed in return to perform the Promised Jobs.   Nor is it clear that Plaintiff's reliance on Defendant's promise – forbearing from taking other projects that would interfere with the Promised Jobs – was consideration for Defendant's promise.  Plaintiff's own allegations state that Plaintiff forbore from taking other projects "as a result" of Defendant's promise, not in exchange for that promise.  (Comp. ¶ 16.)  It is much the same with Plaintiff's use of its Stamp, which Plaintiff never alleges was used in exchange for Defendant's promise.  Based on Plaintiff's allegations, there does not appear to be any "price bargained for" Defendant's guarantee of the Promised Jobs.  See Oscar, 352 N.J. Super. at 485.  Accordingly, though Plaintiff was ready and willing to

---

even if it were to find Plaintiff did not offer consideration for Defendant's promise that Plaintiff could perform those jobs.

perform the Promised Jobs when Defendant refused to allow Plaintiff to perform those jobs, the Court finds that there was no enforceable contract for Defendant to breach.

b)    <u>Violation of New Jersey's Prompt Payment Act</u>

The New Jersey Prompt Payment Act ("NJPPA"), N.J. Stat. § 2A:30A-2, provides that:

> If a subcontractor or subsubcontractor has performed on its contract with the prime contractor or subcontractor and the work has been accepted by the owner … the prime contractor shall pay to its subcontractor and the subcontractor shall pay to its subsubcontractor within 10 calendar days of the receipt of each periodic payment, final payment or receipt of retainage monies, the full amount received for the work of the subcontractor or subsubcontractor based on the work completed or the services rendered under the applicable contract.

§ 2A:30A-2(b).  "If a payment due pursuant to the provisions of this section is not made in a timely manner, the delinquent party shall be liable for the amount of money owed under the contract, plus interest at a rate equal to the prime rate plus 1%."  § 2A:30A–2(c).  Additionally, "the prevailing party shall be awarded reasonable costs and attorney fees." § 2A:30A–2(f).

Because the Court has already found that Defendant is liable to Plaintiff for breach of contract with respect to the Performed Jobs, the Court also finds that Plaintiff is entitled to the outstanding amount due to Plaintiff for the Performed Jobs, as well as interest and attorney's fees and costs, pursuant to the NJPPA.

c)    <u>Unjust Enrichment/Quantum Meruit</u>

Plaintiff also seeks to recover the amount paid for the Performed Jobs based on a quasi-contract theory, i.e., a claim for unjust enrichment or quantum meruit.  However, it is axiomatic that, where an express agreement is enforced, Plaintiff may not pursue damages outside that contract by alleging that Defendant has been unjustly enriched.  <u>See</u> <u>Moser v. Milner Hotels, Inc.</u>, 6 N.J. 278, 280 (1951); <u>Kas Oriental Rugs, Inc. v. Ellman</u>, 394 N.J. Super. 278, 286 (App. Div.), <u>certif.</u> <u>denied</u>, 192 N.J. 74 (2007); <u>see also</u> <u>Suburban Transfer Serv., Inc. v. Beech</u>

Holdings, Inc., 716 F.2d 220, 226–27 (3d Cir. 1983) (finding that, under New Jersey law, constructive or quasi-contractual remedy "to prevent unjust enrichment or unconscionable benefit ... will not be imposed ... if an express contract exists concerning the identical subject matter.")  Because it has already found that Defendant is liable to Plaintiff for the amount due for the Performed Jobs based on a breach of contract, the Court finds that Plaintiff cannot simultaneously prevail on a claim for unjust enrichment or quantum meruit.

d)      Promissory Estoppel

To establish liability based on promissory estoppel a plaintiff must show "(1) a clear and definite promise; (2) made with the expectation that the promisee will rely on it; (3) reasonable reliance; and (4) definite and substantial detriment."  Segal v. Lynch, 211 N.J. 230, 253 (2012). Consistent with the other two quasi-contract claims mentioned above, promissory estoppel generally serves as a stop-gap where no valid contract exists to enforce a party's promise.  "It is only when the parties do not agree that the law interposes and raises a promise.  When an express contract exists, there must be a rescission of it before the parties will be remitted to the contract which the law implies, in the absence of that agreement which they made for themselves." Moser, 6 N.J. at 280-81 (quoting Voorhees v. Executors of Woodhull, 33 N.J.L. 494, 496-497 (E. & A. 1869)); see also Carlson v. Arnot-Ogden Mem. Hosp., 918 F.2d 411, 416 (3d Cir. 1990) (noting that promissory estoppel is generally invoked "in situations where the formal requirements of contract formation have not been satisfied and where justice would be served by enforcing a promise.")  As the Court has already found that the parties formed an enforceable contract as to the Performed Jobs and the Pending Jobs, Plaintiff's promissory estoppel claim is superfluous with respect to those jobs.  However, because Plaintiff's allegations do not give rise to an enforceable contract with respect to the Promised Jobs, the Court finds that Plaintiff's claim for promissory estoppel may still provide a basis for relief.

10

Regarding the Promised Jobs, Plaintiff successfully states a claim for promissory estoppel.  First, Plaintiff has alleged that a promise was made.  According to the Amended Complaint, Defendant agreed with Plaintiff and guaranteed at least 136 work orders through the remainder of the season on May 5, 2014.  Second, it is alleged that Defendant's promise was meant to induce Plaintiff's reliance.  (Compl. ¶ 45.)  Plaintiff has also sufficiently pled that its reliance on Defendant's promise was detrimental.  For instance, Plaintiff claims that it "forbore from taking other projects that would interfere with the agreements and promises made by [Defendant]."  (Id. ¶ 16.)  Additionally, Plaintiff provided its Stamp for permitting purposes on the Pending Jobs and the Promised Jobs.  As a result of its reliance, Plaintiff claims that it lost profits on all 136 jobs, and lost the exclusive control of its Stamp.

Finally, the Court finds that Plaintiff reasonably relied upon Defendant's promise, to a point.  While it would be reasonable for Plaintiff to forgo accepting new work from other general contractors or customers that might reasonably interfere with the jobs promised by Defendant at or around the time Defendant made that promise, it is clear Plaintiff could not reasonably rely on Defendant's promise for those 136 jobs indefinitely.  This is evident from the fact that Plaintiff filed this lawsuit a mere seventeen days after Defendant guaranteed Plaintiff the Promised Jobs.  Such an action indicates that Plaintiff had reason to believe Defendant's promise was suspect.  Cf. E.A. Coronis Assoc. v. M. Gordon Const. Co., 90 N.J. Super. 69, 80 (App. Div. 1966) (noting that where a bid made by the defendant subcontractor was "so low as to put [the plaintiff] on notice that it was erroneous," the Plaintiff could not claim reasonable reliance on the defendant's promise).  Therefore, the Court finds that Plaintiff has pled reasonable reliance up and until the date of the filing of this action.

As discussed below in its analysis of the damages sought by Plaintiff, the Court will award compensatory damages commensurate with the expected profit from the Promised Jobs which supplanted those jobs Plaintiff forbore from taking as a result of the aforementioned period of reasonable reliance.  Additionally, the Court will apply the same principles regarding mitigation and avoidance of those damages as it does with respect to the other contract-related damages.

e)    <u>Intentional Misrepresentation</u>

Plaintiff's intentional misrepresentation claim sounds in fraud.  To state a claim for fraud under New Jersey law, a plaintiff must allege "(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages."  <u>Gennari v. Weichert Co. Realtors</u>, 148 N.J. 582, 610 (1997).  However, in order to sustain a claim for equitable fraud, Plaintiff need not prove the element of scienter, i.e., that Defendant had knowledge of the falsity and intended to obtain an undue advantage from that knowledge.  <u>See</u> <u>Jewish Ctr. of Sussex Cnty. v. Whale</u>, 86 N.J. 619, 625 (1981).

First, the Court notes that Plaintiff has sufficiently pled the elements of a legal fraud claim.  Plaintiff has alleged that Defendant intentionally made false representations to induce Plaintiff to perform certain actions, order material and equipment, and obtain its Stamp, when Defendant had no intention of allowing Plaintiff to perform the Pending Jobs or Promised Jobs. (Compl. ¶ 47.)  Further, the Court finds that Plaintiff has alleged facts which support its fraud claim, even in light of the heightened pleading requirements for fraud claims under Fed. R. Civ. P. 9(b).  <u>See</u> <u>In re Burlington Coat Factory Sec. Litig.</u>, 114 F.3d 1410, 1418 (3d Cir. 1997) (noting that "[w]hile state of mind may be averred generally, plaintiffs must still allege facts that show the court their basis for inferring that the defendants acted with 'scienter.'")  Specifically,

12

Plaintiff has pled that Defendants induced Plaintiff to complete the Performed Jobs, and promised Plaintiff the Pending Jobs and Promised jobs in order to obtain Plaintiff's Stamp and get unpaid work from Plaintiff for the Performed Jobs.  The series of events described in Plaintiff's factual allegations, including Defendant's attempt to assuage Plaintiff's concerns over its failure to pay for the performed jobs by promising an additional 136 jobs in the future, and the allegation that Defendant defrauded Plaintiff to secure its Stamp in order that it might use the Stamp to obtain permits for work it did not actually intend Plaintiff to complete, support its position.

Second, because the only new relief Plaintiff may obtain pursuant to its misrepresentation claim is equitable relief, the Court finds that it has easily satisfied the lesser requirements for sustaining a claim for equitable fraud.[5]  Plaintiff contends that, but for Defendant's promise that Plaintiff would perform the Pending Jobs and the Promised Jobs, it would not have applied its Stamp in order that Defendant could obtain electrical permits for the Pending Jobs.  (Compl. ¶ 21.)  Because the Court finds that Defendant engaged in a misrepresentation amounting to fraud, Plaintiff is entitled to the equitable relief it seeks, which the Court discusses infra at Part II.B.4., in its analysis of the applicable damages.

4.     Emcasco Factors

Fourth, and lastly, the Court must consider the so-called Emcasco factors when determining whether to enter default judgment.  The Court considers: (1) whether the defaulting party has a meritorious defense; (2) the prejudice suffered by the plaintiff seeking default; (3) the

---

[5] Based on Plaintiff's submissions with its Motion for Default Judgment, it appears Plaintiff only seeks the money damages owed to it under the breached agreements, injunctive relief with respect to the Stamp, and attorneys' fees for all of its claims.  Plaintiff apparently no longer seeks "penalties [and] punitive damages" for its intentional misrepresentation claim.  (See Compl., Count V.)  Because Plaintiff is entitled to the compensatory damages and the attorneys' fees pursuant to its breach of contract claims, the Court finds the only relief remaining is the equitable relief Plaintiff seeks in Count VI.

defaulting party's culpability in bringing about default.  Bridges Fin. Grp., Inc. v. Beech Hill Co., Inc., Civ. No. 09-2686, 2011 WL 1485435, at *3 (D.N.J. Apr. 18, 2011) (citing Doug Brady, Inc. v. N.J. Bldg. Laborers Statewide Funds, 250 F.R.D. 171, 177 (D.N.J. 2008) (citing Emcasco Ins. Co. v. Sambrick, 834 F.2d 71, 74 (3d Cir. 1987)).  In this case, all three of these factors weigh in favor of granting a default judgment.  First, there is no indication that Defendant has a cognizable defense to Plaintiff's allegations.  See Hill v. Williamsport Police Dept., 69 Fed. App'x 49, 52 (3d Cir. 2003) ("Because the defendants had not yet filed an answer, the District Court was unable to evaluate whether they had a litigable defense, [rendering this first] factor . . . inconclusive.").  Second, because Defendant has wholly failed to answer the Amended Complaint or otherwise appear, Plaintiff suffers prejudice if it does not receive a default judgment because it has no alternative means of vindicating its claim against the defaulting party.  See Directv, 2006 WL 680533, at *2.  Third, the Defendant's failure to respond permits the Court to draw an inference of culpability on its part.  See Surdi v. Prudential Ins. Co. of Am., Civ. No. 08-225, 2008 WL 4280081, at *2 (D.N.J. Sept. 8, 2008).  Thus, the Emcasco factors weigh in favor of entering default judgment.

> 5.    Conclusion

In light of the foregoing analysis, the Court finds that Plaintiff is entitled to a default judgment against Defendant.

**B.    Damages**

Although a plaintiff's allegations pertaining to the amount of damages it seeks are not treated as true upon the entry of a default judgment, Comdyne I, Inc. v. Corbin, 908 F.2d 1142, 1149 (3d Cir. 1990), if the damages are for a "sum certain or for a sum which can by computation be made certain, a further evidentiary inquiry is not necessary and a district court may enter final judgment," Trucking Emps. of N. Jersey Welfare Fund, Inc. v. Moskowitz Motor

Transp., Inc., Civ. No. 05 -5605, 2007 WL 608436, at *3 (D.N.J. Feb. 23, 2007) (citing Fed. R.

Civ. P. 55(b)(1)).  "A claim for damages is not a sum certain unless there is no doubt as to the

amount to which a plaintiff is entitled as a result of the defendant's default.  Such situations

include actions on money judgments, negotiable instruments, or similar actions where the

damages sought can be determined without resort to extrinsic proof."  Id. (internal quotation

marks and citation omitted).  Here, only the damages for the amount due for the Performed Jobs

are ascertainable.  Because the Court requires further documentation to support many of the

damages sought by Plaintiff, the Court will permit Plaintiff to submit additional documentation

within twenty-one days of this Opinion and the accompanying Order and Judgment, in

accordance with the applicable case law and Rules of Court.

1.      Compensatory Damages

Plaintiff seeks actual damages of $288,421.88.  (Pl.'s Cert. of Amt. Due of Keith Truskin

("Truskin Cert.") ¶¶ 6, 11, 12, 14.)  In support of this allegation, Plaintiff submits the

certification of Keith Truskin, the Chief Financial Officer of Plaintiff.  Mr. Truskin affirms that

the actual damages resulting from Defendant's actions are $288,421.88.  (See id.)  Those

damages include: (a) $21,425.00 due for the Performed Jobs, (b) $34,000 for expenses incurred

by Plaintiff for the rental and purchase of materials and equipment for the Pending Jobs, (c)

$14,461.88 for lost profits from the Pending Jobs, and (d) $218,535.00 for lost profits from the

Promised Jobs.  (Id.)

For breach of contract, Defendant is liable to Plaintiff for "all the natural and probable

consequences of the breach of that contract."  Pickett v. Lloyd's, 131 N.J. 457, 474 (1993).

Often, courts in New Jersey award compensatory damages, i.e., damages which put the innocent

party in the position he or she would have achieved had the contract been completed, in breach

of contract actions.  Totaro, Duffy, Cannova and Co., LLC. v. Lane, Middleton & Co., LLC, 191

15

N.J. 1, 13 (2007) (citing <u>Donovan v. Bachstadt</u>, 91 N.J. 434, 443-44 (1982)).  Those damages

may include lost profits, so far as they can be determined with a "reasonable degree of certainty."

<u>Stanley Co. of Am. V. Hercules Powder Co.</u>, 16 N.J. 295, 314 (1954).  For promissory estoppel,

Plaintiff is entitled to the damages flowing from the loss due to its detrimental reliance on

Defendant's promise regarding the Promised Jobs.  <u>Pop's Cones, Inc. v. Resorts Int'l Hotel, Inc.</u>,

307 N.J. Super. 461, 472 (App. Div. 1998) (citing <u>Peck v. Imedia, Inc.</u>, 293 N.J. Super. 151, 168

(App. Div.) <u>certif. denied</u>, 147 N.J. 262 (1996)).

 The Court finds that only $21,425.00 of the amount sought by Defendant are

ascertainable damages at this time.  The Invoices attached as Exhibit 1 to the Amended

Complaint confirm this amount owed for the Performed Jobs, and the Court need not inquire

further concerning the damages incurred by Defendant's failure to pay Plaintiff for the work

done on these jobs.  <u>See</u>, <u>e.g.</u>, <u>JPMorgan Chase Bank, N.A. v. Candor Constr. Grp., Inc.</u>, Civ.

No. 08–3836, 2010 WL 3210521, at *2-3 (D.N.J. Aug. 12, 2010) (Director of Construction for

plaintiff testified and showed invoice spreadsheets displaying unpaid balances and payments

plaintiff made on behalf of defendant); <u>Imperial Constr. Grp., Inc. v. Jocanz Inc.</u>, Civ. No. 06–

709, 2008 WL 2966794, at *4–6 (D.N.J. July 31, 2008) (plaintiff showed evidence of damages

by submitting checks plaintiff paid on behalf of defendant and unpaid invoices sent to

defendant).

 The damages from the Pending Jobs and the Promised jobs, however, are not

ascertainable without further evidentiary inquiry.  Plaintiff has not submitted any of its own

receipts or invoices to support the expenses it apparently incurred in anticipation of the Pending

Jobs.[6]  Nor do Defendant's Invoices, attached as Exhibit 2 to the Amended Complaint, indicate

what work Plaintiff was contracted to perform for the Pending Jobs, or how much it was to be

paid for that work.  Further, there is no documentation anywhere in the record suggesting what

type of work was to be performed by either Defendant or Plaintiff as part of the Promised Jobs,

let alone what Plaintiff's amount due would be.  The Court is left with only the certified

statements of Mr. Truskin, which is particularly concerning where the amounts sought for the

Pending Jobs ($48,461.88) and the Promised Jobs ($218,535.00) are significantly more than the

amount Plaintiff is entitled to recover for the Performed Jobs.

     Without more, there is simply no way of determining what the Plaintiff is due for the

amounts expended in anticipation of the Pending Jobs, what profits Plaintiff would have received

from the Pending Jobs, and what amount Plaintiff would be entitled to recover for its reliance on

the Promised Jobs, without the submission of additional evidence.  At this time it is unclear what

the Pending Jobs and Promised Jobs were actually worth, what the profits would have been on

those jobs, whether Defendant could reasonably foresee that these damages would flow from

breaching its promise, and whether Plaintiff could or did mitigate any of these damages.  See

Sommer v. Kridel, 74 N.J. 446, 454 n.3 (1977) ("It is well settled that a party claiming damages

for a breach of contract has a duty to mitigate his loss.") (citing Frank Stamato & Co. v. Borough

of Lodi, 4 N.J. 14 (1950); Sandler v. Lawn-A-Mat Chem. & Equip. Corp., 141 N.J. Super. 437

(App. Div. 1976); Wolf v. Marlton Corp., 57 N.J. Super. 278 (App. Div. 1956); 5 Corbin on

Contracts (1964 ed.), § 1039 at 241 et seq.; McCormick, Damages, § 33 at 127 (1935)).

---

[6] The Court does, however, accept the allegation that the materials and equipment purchased and rented were job specific, not suitable for any other projects, and would not have been purchased by Plaintiff but for Defendant's promise that Plaintiff would perform the Pending Jobs.  (See Compl. ¶¶ 12-14.)

Accordingly, Plaintiff must submit documentation supporting the amount paid for purchase and rental of materials and equipment in anticipation of the Pending Jobs, the value of the Pending Jobs, and the expected profit to be received from each of the Pending Jobs, including how that profit is calculated.  Plaintiff must also submit evidence concerning any attempts it made to mitigate the damages caused by Defendant's failure to fulfill its promise to allow Plaintiff to perform the Pending Jobs, including any other jobs it performed during that time which were taken in lieu of the Pending Jobs and the profits it earned from those jobs.  In the absence of any mitigating steps, Defendant should document any reasons for its failure to take such steps.  Moreover, in light of the Court's discussion of the scope of Plaintiff's reasonable reliance on Defendant's promise for the Promised Jobs, Plaintiff should submit affidavits or documentation supporting any work that was reasonably turned down in anticipation of those jobs prior to the filing of this action, and the value of the Promised Jobs that would have been performed in lieu of the rejected jobs, including the anticipated profits, and any other relevant information, such as attempts made by Plaintiff to mitigate its damages.

Plaintiff shall submit the appropriate documentation within twenty-one days of this Opinion and the accompanying Order and Judgment, in accordance with the applicable case law and Rules of Court.

2.   Interest

As noted supra at Part II.A.3.(b), Plaintiff is entitled to interest on the amount due for the Performed Jobs at the prime rate plus 1%, pursuant to the NJPPA.  § 2A:30A–2(c).  When the prime rate is "easily ascertainable from financial publications," the Court may "take judicial notice of the applicable rate."  Rankin v. DeSarno, 89 F.3d 1123, 1134 n.11 (3d Cir. 1996), overruled on other grounds.  "'Prime rate' means the average predominant prime rate, as

determined by the Board of Governors of the Federal Reserve System, quoted by commercial banks to large businesses …." N.J. Stat. § 54:48–2.

While Plaintiff has not submitted evidence regarding what the prime rate during the applicable time period was, the Court notes that the Board of Governors of the Federal Reserve System set the prime rate at 3.25% in January 2009, and it has remained at that rate through the present date.[7] Therefore the applicable interest rate under the NJPPA is 4.25%.

That, however, is not the end of the Court's inquiry when calculating the interest due. The interest provision of the NJPPA requires a calculation of interest "beginning on the day after the required payment date and ending on the day on which the check for payment has been drawn." § 2A:30A-2(c). Though Mr. Truskin's Certification indicates that the amounts due on the Invoices for the Performed Jobs were due "upon receipt" of said invoices, it is not clear on what date Defendant received those invoices. Therefore, in order to calculate the interest due, Plaintiff must submit evidence demonstrating to the Court what the applicable interest accruing period under the NJPPA is.

Plaintiff may submit the appropriate documentation within twenty-one days of this Opinion and the accompanying Order and Judgment, in accordance with the applicable case law and Rules of Court.

### 3.   Attorney's Fees

Plaintiff is also entitled to "reasonable costs and attorney fees" under the NJPPA. § 2A:30A–2(f). The Court has the discretion to determine whether an amount of requested

---

[7] The weekly current prime rate is listed on the Board of Governors of the Federal Reserve System's website at http://www.federalreserve.gov/releases/h15/current/default.htm (last accessed March 23, 2015). Historical charts for the daily, weekly, monthly, and yearly rates are available at http://www.federalreserve.gov/releases/h15/data.htm (last accessed March 23, 2015.) Additionally, the Wall Street Journal publishes the daily prime rates, along with the prime rate ranges from the prior 52 weeks, at http://online.wsj.com/mdc/public/page/2_3020-moneyrate.html (last accessed March 23, 2015). During the period covered by the events giving rise the present litigation until the date of this Opinion, the prime rate has remained at 3.25%.

attorneys' fees is reasonable.  Spectrum Produce Distrib., Inc. v. Fresh Mktg., Inc., Civ. No. 11–06368, 2012 WL 2369367, at *3 (D.N.J. June 20, 2012).  Plaintiff, however, has not submitted an affidavit or evidence setting forth its attorneys' fees and actual expenses which relate to the work expended in furtherance of this matter.  See Teamsters Health & Welfare Fund of Phila. and Vicinity v. Dubin Paper Co., Civ. No. 11–7137, 2012 WL 3018062, at *5 (D.N.J. July 24, 2012) ("A request for fees must be accompanied by 'fairly definite information as to hours devoted to various general activities, e.g., partial discovery, settlement negotiations, and the hours spent by various classes of attorneys.'") (quoting Evans v. Port Auth., 273 F.3d 346, 361 (3d Cir. 2001)); see also Spectrum Produce, 2012 WL 2369367, at *3 (noting that the "lodestar amount," which means the "'number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate,'" is the appropriate method for determining whether a requested amount of attorney's fees is reasonable) (quoting Hensley v. Eckerhart, 461 U.S. 424 (1983)); Blum v. Stenson, 465 U.S. 886, 896 n.11 (1984) (holding that the party seeking damages must provide evidence of a reasonable hourly rate "in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation."); Spectrum Produce, 2012 WL 2369367, at *5. (further holding that the party seeking damages must provide evidence that the amount of time spent on the matter was reasonable). Accordingly, the Court cannot determine what attorneys' fees should be awarded at this time.

Plaintiff may submit an application for attorneys' fees within twenty-one days of the date of this Opinion and the accompanying Order and Judgment, in accordance with the applicable case law and Rules of Court.

    4. Equitable Relief

With respect to the equitable relief it seeks, apparently Plaintiff desires the return or destruction of any materials in Defendant's possession bearing its Stamp.  In support of its

request, Plaintiff claims it "lost control" of its Stamp when it approved the drawings for the

Pending Jobs, (id. ¶ 24), and Plaintiff is the only entity with a right to possess or use its Stamp.

(Id. ¶ 55.)  That Plaintiff faces administrative penalties or sanctions for improper or unauthorized

use of its Stamp only reinforces Plaintiff's position.  See N.J. Admin. Code § 13:31-3.3(b).

Because any drawing containing Plaintiff's Stamp is the sole property of Plaintiff, and may not

be used by Defendant or any other electrician where Plaintiff will not be supervising the work,

Plaintiff requests that Defendant cease using any drawing containing Plaintiff's Stamp, and

destroy or return any documents containing Plaintiff's Stamp.  (Compl. ¶ 58.)  Because it appears

Plaintiff's position is supported by its allegations and the certification of Mr. Truskin, the Court

finds that Plaintiff is entitled to equitable relief pursuant to its intentional misrepresentation

claim.[8]

      In accordance with the accompanying Order and Judgment, Defendant shall cease and

desist from using any and all documents containing Plaintiff's Stamp, and shall destroy or return

all of said documents to Plaintiff within seven days of the entry of that Order.

## III.   CONCLUSION

      For the reasons stated above, the Court will grant Plaintiff's Motion for Default

Judgment.  Partial Judgment in the amount of $21,425.00 shall be entered for Plaintiff.  Plaintiff

shall submit the required additional documentation to the Court, in accordance with the terms of

this Opinion and the accompanying Order and Judgment, within twenty-one days of the entry of

the Order and Judgment.  Further, Defendant shall be enjoined from any continued use of any

---

[8] As noted supra at note 3, Plaintiff attempts to assert a separate "Demand for Equitable Relief, Injunctive, and Declaratory Judgment" in Count VI, (Compl. at 11-13), but does not explain what cause of action entitles it to the equitable relief it seeks.  Whether Plaintiff intended to state a cause of action for conversion or some other common law claim, the Court finds that Plaintiff's successful intentional misrepresentation claim entitles it to the equitable relief it now seeks.

materials bearing Plaintiff's Stamp, and Defendant shall be ordered to destroy or return any

documents containing Plaintiff's Stamp.  An appropriate Order shall issue today.


Dated:___3/25/2015___                                    _s/ Robert B. Kugler_
                                                        ROBERT B. KUGLER
                                                        United States District Judge